**No. 22-35076**
_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**
_____

TERRY EUGENE IVERSEN

*Petitioner-Appellant*,

v.

SUSAN WASHBURN

*Respondent-Appellee*.

On Appeal from the United States District Court
for the District of Oregon
No. 2:20-cv-01524-AA
Hon. Ann L. Aiken

_____

**BRIEF OF OREGON JUSTICE RESOURCE CENTER AS *AMICUS
CURIAE* IN SUPPORT OF PETITIONER-APPELLANT**

_____

Walter Fonseca
P.O. Box 5248
Portland, Oregon 97208
(503) 944-2270
wfonseca@ojrc.info

*Attorney for Amicus Curiae*
Oregon Justice Resource Center

i

## DISCLOSURES

The Oregon Justice Resource Center certifies that it is a non-profit organization. It has no parent corporation and no stock, so no publicly held corporation owns more than ten percent of its stock. Fed. R. of App. P. 26.1(a)(4)(A).

No party's counsel authored this brief in whole or in part; no party's counsel contributed money that was intended to fund the preparation or submission of this brief; and no person, other than amicus curiae, its members, or its counsel, contributed money that was intended to fund the preparation of submission of this brief. Fed. R. of App. P. 29(a)(4)(E)

All parties consent to the filing of this brief. Fed. R. of App. P. 29(a)(4).

# TABLE OF CONTENTS

Interest of Amicus Curiae ........................................................................1

Argument...................................................................................................1

  I.   A life without parole sentence is different. .....................................3

    A.   A life without parole sentence removes all possibility of redemption.......6

    B.   Prison conditions for a person sentenced to life without parole make the punishment uniquely harsh. ...............................................................7

    C.   A life without parole sentence is particularly cruel for people with mental illness.........................................................................................9

  II.   The imposition of a life without parole sentence on a person with mental illness for a misdemeanor act is contrary to the evolving standards of decency..........................................................................................12

    A.   A life without parole sentence for a misdemeanor act is a "unique quirk" in Oregon law and is rarely applied. ..............................................12

    B.   A life without parole sentence for a misdemeanor act, particularly for a person with mental illness, does not serve legitimate penological goals. .......17

Conclusion ..............................................................................................21

# TABLE OF AUTHORITIES

**CASES**                                                    **PAGE(S)**

*Armstrong v. Newsom*,
  58 F.4th 1283 (9th Cir. 2023) .................................................................. 7

*Atkins v. Virginia*,
  536 U.S. 304 (2002) ................................................................. 4, 16, 20

*Brown v. Plata*,
  563 U.S. 493 (2011) ............................................................................ 7

*Graham v. Florida*,
  560 U.S. 48 (2010) .................................................................... passim

*Gregg v. Georgia*,
  428 U.S. 153 (1976) .......................................................................... 17

*Hudson v. McMillian*,
  503 U.S. 1 (1992) .............................................................................. 7

*Kansas v. Hendricks*,
  521 U.S. 346 (1997) .......................................................................... 19

*Kennedy v. Louisiana*,
  554 U.S. 407 (2008) ...................................................................... 4, 17

*Miller v. Alabama*,
  567 U.S. 460 (2012) ........................................................................... 4

*Porretti v. Dzurend*,
  11 F.4th 1037 (9th. Cir. 2021) ........................................................... 7

*Roper v. Simmons*,
  543 U.S. 551 (2005) ...................................................................... 4, 18

*Schafer v. Maass*,
  122 Or. App. 518, P.2d 474 (1993) ..................................................... 7

*Severy/Wilson v. Board of Parole and Post-Prison Supervision*,
  349 Or. 461, P.3d 119 (2010) ............................................................ 15

*Solem v. Helm*,
  463 U.S. 277 (1983) ........................................................................... 2

*State v. Bartol*,
  368 Or. 598, P.3d 1013 (2021) ............................................................ 5

State v.*Davidson*,
  *360 Or. 370, P.3d 963 (2016)* ........................................................... 13

*State v. Davidson*,
  369 Or. 480, P.3d 246 (2022) ..................................................... 13, 15

*Taylor v. Riojas*,
 141 S. Ct. 52 (2020) ................................................................................7
*Tison v. Arizona*,
 481 U.S. 137 (1987) .............................................................................18
*Trop v. Dulles*,
 356 U.S. 86 (1958) ................................................................................2
*Weems v. United States*,
 217 U.S. 349 (1910) ........................................................................1, 16

## STATUTES                                            PAGE(S)

Or. Rev. Stat. § 137.719 ..........................................................................2, 13
Or. Rev. Stat. § 137.719(1) ............................................................................2
Or. Rev. Stat. § 161.605(3) ............................................................................2
Or. Rev. Stat. § 161.615(1) ............................................................................2
Or. Rev. Stat. § 163.105 ..................................................................................5
Or. Rev. Stat. § 163.105(1) ...........................................................................12
Or. Rev. Stat. § 163.107 .................................................................................14
Or. Rev. Stat. § 163.107(2) ..................................................................... 13, 14
Or. Rev. Stat. § 163.107(3)(a) .......................................................................14
Or. Rev. Stat. § 163.155 .................................................................................13
Or. Rev. Stat. § 163.465 ............................................................................2, 15
Or. Rev. Stat. § 163.465(2)(b) ............................................................. 2, 14, 15

## RULES                                               PAGE(S)

Or. Admin. Rule 213-004-0001 App. 1 ..........................................................15
Or. Admin. Rule 213-008-0003(2) .................................................................15
Or. Admin. Rule 213-017-0006 ......................................................................15

## OTHER AUTHORITIES                                    PAGE(S)

Alison Walsh,
 *The criminal justice system is riddled with racial disparities*,
 *Prison Policy Initiative* (Aug. 15, 2016) ...................................................4
Am. Civ. Liberties Union,
 *A Living Death: Life Without Parole for Nonviolent Offenses*
 (Nov. 2013) ........................................................................................8, 9

Benjamin J. Bovell-Ammon, et al.,
*Association of Incarceration with Mortality by Race from a National Longitudinal Cohort Study*, JAMA Network Open (2021) ...................................7

Bruce J. Winick,
*The Supreme Court's Evolving Death Penalty Jurisprudence,* 50 B.C. L. Rev. 785 (2009) ...................................................................18

Craig Haney,
*The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment*, US Dep't Health and Human Serv, Working Paper Prepared for the "From Prison to Home" Conference (2001) .......................................................11

David M. Bieri,
*Is Tougher Better? The Impact of Physical Prison Conditions on Inmate Violence*, Int'l J. Offender Therapy and Comp. Criminology (Apr. 13, 2011) ....................................................................................7

Equal Justice Initiative,
*Prison Conditions* ............................................................................7

Evelyn J. Patterson,
*The Dose-Response of Time Served in Prison on Mortality: New York State, 1989–2003*, 103 Am. J. Public Health 523 (2013) ...............................8

Fiona G. Kouyoumdjian, et al.,
*Do People Who Experience Incarceration Age More Quickly? Exploratory Analyses Using Retrospective Cohort Data on Mortality from Ontario, Canada*, PLOS ONE (Apr. 14, 2017).................................................................8

Helen Jung,
*Gov. John Kitzhaber stops executions in Oregon, calls system 'compromised and inequitable,'* The Oregonian, Nov. 22, 2011.......................................5

Howard Zehr,
*Doing Life: Reflections of Men and Women Serving Life Sentences* (1996) ...................................................................................................3

Jeffrey L. Metzner & Jamie Fellner,
*Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. Am. Acad. Psychiatry & L. 104 (2010) ...........................11

Jillian Peterson & Kevin Heinz,
*Understanding Offenders with Serious Mental Illness in the Criminal Justice System*, 42 Mitchell Hamline L. Rev. 537 (2016)........................................10, 11

Kevin Drew,
  *Arkansas Prepares to Execute Mentally Ill Inmate*, CNN.com
  (Jan. 5, 2004)........................................................................................19
Lauren Dake & Conrad Wilson,
  *Outgoing Oregon governor commutes death row sentences, orders execution
  chamber dismantled*, Oregon Public Broadcasting,
  Dec. 13, 2022 ..........................................................................................5
Lawrence O. Gostin,
  *'Old' and 'new' institutions for persons with mental illness: Treatment,
  punishment, or preventative confinement?*,
  J. Royal Inst. Pub. Health (2007)...........................................9, 10, 11
Leah Wang & Wendy Sawyer,
  *New data: State prisons are increasingly deadly places*,
  Prison Policy Initiative (June 8, 2021)....................................................7
Letter from Abolitionist Law Center, et al.,
  to Special Rapporteur E. Tendayi Achiume, et al. (Sept. 15, 2022) ....................19
Michael Millimann, et al.,
  *Releasing Older Prisoners*, *in* 4 *Reforming Criminal Justice* 326
  (Erik Luna, ed., 2017) .............................................................................7
Michael Mullan,
  *How U.S. Society has Treated Those with Mental Illnesses*,
  24 Rich. Pub. Int. L. Rev. 79 (2021) ............................................10, 11
Nat'l Alliance on Mental Illness,
  *Mental Health Treatment While Incarcerated* ......................................10
National Conference of State Legislatures,
  *States and Capital Punishment* (Aug. 11, 2021) ...................................5
Or. Dept. of Corrections,
  *AIC Population Profile for 03/01/2023* .............................................16
Penal Reform International,
  *Life Imprisonment: A Policy Briefing* (2018) .....................................17
Stephen P. Garvey,
  *Aggravation and Mitigation in Capital Cases: What do Jurors Think?*
  98 Colum. L. Rev. 1538 (1998) ...........................................................19
Tape Recording, Senate Comm. on Judiciary,
  SB 370, April 3, 2001, Tapes 82-85....................................................13
Tape Recording, Senate Comm. on Judiciary,
  SB 370, May 10, 2001, Tapes 132, Side B ................................... 13, 14

Terrell Carter, et al.,
  *Redeeming Justice*, 116 Nw. U. L. Rev. 315 (2021)................................4
Victoria Law,
  *Prisoner Advocates Turn to the UN to End Extreme Prison Sentences*,
  The Nation (Sept. 15, 2022)................................................................17
William W. Berry III,
  *Ending Death by Dangerousness: A Path to the De Facto Abolition of the
  Death Penalty*, 52 Ariz. L. Rev. 889 (2010) ......................................20

## Interest of Amicus Curiae

Amicus Curiae Oregon Justice Resource Center (OJRC) is a Portland-based non-profit organization founded in 2011. OJRC works to dismantle mass incarceration and systemic discrimination in the administration of justice by promoting civil rights and by enhancing the quality of legal representation to traditionally underserved communities. OJRC serves this mission by operating several distinct legal services programs focused on the principle that our criminal legal system should be founded on fairness, compassion, accountability, and evidence-based practices. Pursuant to Federal Rule of Appellate Procedure 29, OJRC respectfully submits this brief in support of Petitioner-Appellant.

## Argument

> *Time works changes, brings into existence new conditions and purposes. Therefore a principle, to be vital, must be capable of wider application than the mischief which gave it birth. This is peculiarly true of constitutions. . . . The [Cruel and Unusual Punishments Clause] may be therefore progressive, and is not fastened to the obsolete, but may acquire meaning as public opinion becomes enlightened by a humane justice.*
>
> —*Weems v. United States*, 217 U.S. 349, 373, 378 (1910).

Mr. Iversen's sentence of life without parole violates the Eighth Amendment's prohibition on cruel and unusual punishment. The Eighth Amendment provides "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." "The final clause prohibits

1

not only barbaric punishments, but also sentences that are disproportionate to the crime committed." *Solem v. Helm*, 463 U.S. 277, 284 (1983). Central to Eighth Amendment jurisprudence is the concept that proportionality is evaluated according to "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion). This doctrine determines whether a sentence violates the Eighth Amendment by examining objective indicia of national consensus as well as "the culpability of the offenders at issue in light of their crimes and characteristics, [and] the severity of the punishment in question." *Graham v. Florida*, 560 U.S. 48, 67 (2010).

Mr. Iversen has been sentenced to life without parole for a single count of public indecency. Public indecency is typically a Class A misdemeanor punishable by up to 364 days in jail. Or. Rev. Stat. § 163.465, Or. Rev. Stat. § 161.615(1). Because Mr. Iversen had prior convictions for public indecency and other sex crimes, he was charged with a Class C felony punishable by up to five years in prison. Or. Rev. Stat. § 163.465(2)(b), Or. Rev. Stat. § 161.605(3). Under Oregon's sex offender recidivism statute, a person convicted of a third felony sex offense receives a presumptive life without parole sentence. Or. Rev. Stat. § 137.719.[1] Mr.

---

[1] While some felony sex crimes are not predicate offenses for the purpose of elevating a misdemeanor public indecency charge to a felony under Or. Rev. Stat. § 163.465(2)(b) (e.g., incest with a child victim and compelling prostitution), and some predicate offenses that may elevate a misdemeanor public indecency charge to a felony are not felony sex crimes that trigger

Iversen had the requisite prior convictions to subject him to such a penalty. Despite mitigating facts and circumstances, including the trial court's recognition that the crime was a "misdemeanor act," ER-206; evidence that Mr. Iversen's crimes reduced in seriousness over time, ER-33; and Mr. Iversen's diagnoses of exhibitionism, paraphilia, and hypersexuality of sexual impulse control disorder, PSR-15, and amenability to treatment, ER-36; the court sentenced Mr. Iversen to life without parole.

A life without parole sentence warrants review under the evolving standards of decency doctrine. A life without parole sentence imposed upon someone based on misdemeanor conduct that resulted from diagnosed mental illnesses is uniquely harsh, serves no legitimate penological interests, and is therefore contrary to the evolving standards of decency.

## I.   A life without parole sentence is different.

*A life sentence means that, in effect, you're dead. It's just another form of a death sentence. Instead of having the gall to do it in one fell swoop, you die one day at a time.*

—Thomas Martin[2]

---

a presumptive life without parole sentence under Or. Rev. Stat. § 137.719(1) (e.g., sexual abuse in the third degree and sexual misconduct), the same prior conviction and sentence may be used to do both.

[2] Quoted in Howard Zehr, *Doing Life: Reflections of Men and Women Serving Life Sentences* 44 (1996).

3

The evolving standards of decency doctrine has been applied to cases involving sentences or defendants that are considered "different." In recognizing that "death is different," *Graham*, 560 U.S. at 103 (Thomas, J., dissenting), the Supreme Court has applied the doctrine to determine that capital punishment may not be imposed upon people with severe intellectual disabilities, *Atkins v. Virginia*, 536 U.S. 304 (2002), people whose crimes were committed before the age of eighteen, *Roper v. Simmons*, 543 U.S. 551 (2005), or people convicted of nonhomicide offenses, *Kennedy v. Louisiana*, 554 U.S. 407 (2008). The Supreme Court has also recognized that "children are different," *Miller v. Alabama*, 567 U.S. 460, 481 (2012), warranting application of the evolving standards of decency doctrine in cases holding that youth may not be sentenced to life without parole for nonhomicide offenses, *Graham*, 560 U.S. 48, and that youth may not be sentenced to mandatory life without parole, *Miller*, 567 U.S. 460.

The gravity, disparate application,[3] and unique features of a life without parole ("LWOP") sentence—sometimes referred to as true life or death by

---

[3] The overrepresentation of Black people in the imprisoned population of the United States is well known. But this disproportionality is far more pronounced in life without parole sentences. While Black people make up just over 35% of the jail and prison population, more than double their representation (13%) in the U.S. population, a majority—56.4%—of people serving LWOP sentences are Black. Alison Walsh, *The criminal justice system is riddled with racial disparities*, *Prison Policy Initiative* (Aug. 15, 2016), https://www.prisonpolicy.org/blog/2016/08/15/cjrace/.

incarceration[4]—likewise call for the application of the evolving standards of decency doctrine:

> [L]ife without parole sentences share some characteristics with death sentences that are shared by no other sentence. The State does not execute the offender sentenced to life without parole, but the sentence alters the offender's life by a forfeiture that is irrevocable. It deprives the convict of the most basic liberties without giving hope of restoration, except perhaps by executive clemency—the remote possibility of which does not mitigate the harshness of the sentence.

*Graham*, 560 U.S. at 69.

Next to death, LWOP is the most serious penalty that can be imposed on a person convicted of any crime. In many jurisdictions, life without parole and parole-eligible life sentences have—by statute or practice—replaced the death penalty as *the* most serious penalty that can be imposed for any crime.[5] In Oregon, only the most serious forms of murder are punishable by death. Or. Rev. Stat. § 163.105; *State v. Bartol*, 368 Or. 598, 496 P.3d 1013 (2021). By statute, the sentence is meant to be sought sparingly; in practice, it is obsolete. Since 2011, a

---

[4] *See* Terrell Carter et al., *Redeeming Justice*, 116 Nw. U. L. Rev. 315, 328 (2021), available at https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi ?article=1471&context=nulr (describing how the Right to Redemption Committee, a group of people imprisoned in Pennsylvania, chose to call LWOP sentences "death by incarceration").

[5] *See* National Conference of State Legislatures, *States and Capital Punishment* (Aug. 11, 2021), https://www.ncsl.org/civil-and-criminal-justice/states-and-capital-punishment ("In recent years, New Mexico (2009), Illinois (2011), Connecticut (2012), Maryland (2013), New Hampshire (2019), Colorado (2020) and Virginia (2021) have legislatively abolished the death penalty[.]")..

5

moratorium has halted all executions.[6] And in 2022, Governor Kate Brown commuted the sentences of Oregon's entire death row to life in prison.[7]

## A.     A life without parole sentence removes all possibility of redemption.

Every person sentenced to life without parole is sentenced to die in prison. An LWOP sentence thus represents a complete abdication of the penological goal of rehabilitation; as the Supreme Court observed in *Graham*, it "means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the person sentenced], he will remain in prison for the rest of his days." 560 U.S. at 70 (citation omitted). The abandonment of any rehabilitative ideals inherent in LWOP sentences removes any motivation for people condemned to self-improve or grow. There is no future to look forward to, no purpose in dreaming, no opportunity for redemption. There is no completion of custodial programming or reward for good behavior through earned time off sentences, and there is no chance to engage in activities necessary to prepare for successful reentry into society. People sentenced to LWOP are thus forced into terminal stagnation.

---

[6] Helen Jung, *Gov. John Kitzhaber stops executions in Oregon, calls system 'compromised and inequitable,'* The Oregonian, Nov. 22, 2011, https://www.oregonlive.com/pacific-northwest-news/2011/11/gov_john_kitzhaber_stops_all_e.html.
[7] Lauren Dake & Conrad Wilson, *Outgoing Oregon governor commutes death row sentences, orders execution chamber dismantled*, Oregon Public Broadcasting, Dec. 13, 2022, https://www.opb.org/article/2022/12/13/oregon-governor-kate-brown-death-penalty-sentence-commutations/.

6

**B.     Prison conditions for a person sentenced to life without parole make the punishment uniquely harsh.**

Prison conditions in the United States are notoriously harsh. Recent data from the Bureau of Justice Statistics on mortality in state and federal prisons reveal growing numbers of in-custody deaths, both from "major or unnamed illness[es]" and, in increasing share, "from discrete unnatural causes, like suicide, homicide, and drug and alcohol intoxication."[8] People who need medical care, help managing their disabilities, mental health and addiction treatment, and suicide prevention are denied care, ignored, punished, and placed in solitary confinement.[9] Courts have repeatedly acknowledged the reality of these harsh conditions.[10]

Imprisoned people suffer a severe physical, emotional, and psychological toll. Overwhelming evidence demonstrates that, due to "the stress of incarceration,

---

[8] Leah Wang & Wendy Sawyer, *New data: State prisons are increasingly deadly places*, Prison Policy Initiative (June 8, 2021), https://www.prisonpolicy.org/blog/2021/06/08/prison_mortality/.

[9] *See* Equal Justice Initiative, *Prison Conditions*, https://eji.org/issues/prison-conditions/ (last visited Mar. 15, 2023); David M. Bieri, *Is Tougher Better? The Impact of Physical Prison Conditions on Inmate Violence*, Int'l J. Offender Therapy and Comp. Criminology (Apr. 13, 2011), https://www.researchgate.net/profile/David-Bierie/publication/51048432_Is_Tougher_Better_The_Impact_of_Physical_Prison_Conditions_o n_Inmate_Violence/links/0046353a1954ce04e6000000/Is-Tougher-Better-The-Impact-of-Physical-Prison-Conditions-on-Inmate-Violence.pdf.

[10] *See, e.g.*, *Taylor v. Riojas*, 141 S. Ct. 52, 53 (2020) (per curiam) (recognizing allegations of "deplorably unsanitary conditions"); *Brown v. Plata*, 563 U.S. 493 (2011) (recognizing allegations of, among other things, severe overcrowding and lack of access to treatment for medical and mental health conditions); *Hudson v. McMillian*, 503 U.S. 1 (1992) (recognizing allegations of assault by a corrections officer on a prisoner); *Armstrong v. Newsom*, 58 F.4th 1283 (9th Cir. 2023) (recognizing allegations of abuse by prison staff, including a "staff culture of targeting inmates with disabilities"); *Porretti v. Dzurend*, 11 F.4th 1037, 1052 (9th. Cir. 2021) (recognizing allegations of the denial of medication for severe mental illness); *Schafer v. Maass*, 122 Or. App. 518, 522, 858 P.2d 474, 476 (1993) (recognizing allegations of "ongoing and periodical" assaults).

poor nutrition, inadequate health care, the dangers of prison life, and the damaging effects of pre-incarceration behaviors and poverty," time spent in prison correlates with a shorter lifespan.[11] In addition to the stress caused by prison life, an LWOP sentence alone can cause "psychological trauma": "Studies on the mental health consequences of indefinite detention have found that the indefinite terms of detainees' confinement causes them to develop feelings of hopelessness and helplessness that lead to depressive symptoms, chronic anxiety, despair, and suicidal ideation."[12]

People serving life without parole are not only sentenced to endure these conditions for the rest of their lives, but often face additional restrictions and punishment not explicit in their sentences:

> As a matter of policy, some prisons categorically deny drug treatment, counseling, vocational and educational programs, and other rehabilitative services to prisoners who are sentenced to die in prison and are ineligible for parole. Other prisons limit LWOP prisoners' access to such rehabilitative services on account of their sentences. Prisoners incarcerated in state prisons particularly confront few

---

[11] Michael Millimann et al., *Releasing Older Prisoners*, *in* 4 *Reforming Criminal Justice* 326 (Erik Luna, ed., 2017). *See generally* Benjamin J. Bovell-Ammon et al., *Association of Incarceration with Mortality by Race from a National Longitudinal Cohort Study*, 4 JAMA Network Open (2021); Fiona G. Kouyoumdjian et al., *Do People Who Experience Incarceration Age More Quickly? Exploratory Analyses Using Retrospective Cohort Data on Mortality from Ontario, Canada*, PLOS ONE (Apr. 14, 2017), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0175837 (last visited Mar. 15, 2023); Evelyn J. Patterson, *The Dose-Response of Time Served in Prison on Mortality: New York State, 1989–2003*, 103 Am. J. Public Health 523 (2013).
[12] Am. Civ. Liberties Union, *A Living Death: Life Without Parole for Nonviolent Offenses* 184 (Nov. 2013), https://www.aclu.org/files/assets/111813-lwop-complete-report.pdf (last visited Mar. 15, 2023).

opportunities for education, meaningful work, or productive programs or activities. Many of the LWOP prisoners with whom the ACLU spoke or corresponded reported that other prisoners with release dates are prioritized for programming, which leaves lifers waiting for years to enroll in GED classes, enter much-needed intensive drug treatment, obtain prison jobs, or receive vocational training. Twenty-eight percent of prisoners surveyed by the ACLU reported being denied access to drug treatment, vocational, or educational programs in prison. This number varied substantially between jurisdictions.[13]

For over a decade, OJRC has represented, corresponded with, and worked alongside people serving life without parole sentences in Oregon state prisons. Reports of time spent in Oregon's prisons are consistent with reports by the ACLU: an LWOP sentence limits access to privileges such as drug and alcohol treatment, opportunities to participate in work crews, volunteer-led programs, and other programming. Moreover, the prisons within which people sentenced to LWOP are confined are primarily in remote or rural areas of the state, typically hours from loved ones, making visits difficult to impossible.

## C.    A life without parole sentence is particularly cruel for people with mental illness.

For people with mental illness, like Mr. Iversen, a sentence of life without parole is particularly cruel. Mental illness exists on a continuum, with a wide range of diagnoses, symptoms, and treatability. At its most extreme, a mental illness can

---

[13] *Id.* at 189.

9

impair cognition and impulse control, manifest in psychosis, or impact a person's ability to understand why or how they were imprisoned.[14]

Despite the efficacy of current treatments for serious mental illness—with seventy to ninety percent of people experiencing "significantly reduced symptoms and better quality of life when treated with a combination of pharmacological medicine and psychosocial support"[15]—prisons are ill-equipped to meet the needs of people with mental illness. A 2010 submission to the United Nations found that "only one-third of U.S. prisoners categorized as having a mental health condition are given any treatment while in prison."[16] For people who do receive treatment, that treatment is often extremely limited and inadequate. For people with LWOP sentences, treatment is even less likely, as services are often more difficult or even impossible to obtain.

Without adequate treatment and support, people with mental illness face worse conditions and harsher discipline throughout their terms of incarceration.[17]

---

[14] Lawrence O. Gostin, *'Old' and 'new' institutions for persons with mental illness: Treatment, punishment, or preventative confinement?*, J. Royal Inst. Pub. Health 122 (2007), https://www.sjsu.edu/people/rita.manning/courses/292/s1/Gostin.pdf (last visited Mar. 15, 2023)

[15] Nat'l Alliance on Mental Illness, *Mental Health Treatment While Incarcerated*, https://www.nami.org/Advocacy/Policy-Priorities/Improving-Health/Mental-Health-Treatment-While-Incarcerated (last visited Mar. 15, 2023).

[16] *Id.*

[17] *See* Jillian Peterson & Kevin Heinz, *Understanding Offenders with Serious Mental Illness in the Criminal Justice System*, 42 Mitchell Hamline L. Rev. 537, 538–39 (2016), https://open.mitchellhamline.edu/cgi/viewcontent.cgi?article=1022&context=mhlr (last visited Mar. 15, 2023). People with mental illness "often have a harder time navigating the prison environment than their non-mentally ill counterparts, making it difficult to access needed treatment and resources." *Id.* at 550–51.

Imprisoned people with mental illness are more likely to be sexually and physically abused while in custody[18] and more likely to face segregation, including solitary confinement.[19] Segregation and solitary confinement can have catastrophic consequences on mental health.[20] Indeed, prison conditions often exacerbate the symptoms of mental illness,[21] leading to cycles of decompensation and punishment; "an endless, vicious cycle of inhuman and degrading treatment."[22] For people with LWOP sentences, these cycles will last forever. Unsurprisingly, imprisoned people with mental illnesses are at "a very high risk of harm and death" while incarcerated.[23]

A sentence that involves death in prison—whether through capital punishment or life without parole—is undeniably different, warranting application of the evolving standards of decency doctrine. Though the death penalty remains legal in Oregon, in practice LWOP is the harshest sentence available. The

---

[18] Michael Mullan, *How U.S. Society has Treated Those with Mental Illnesses*, 24 Rich. Pub. Int. L. Rev. 79, 110 (2021).

[19] *Id.* at 109-10; Gostin, *supra* note 14, at 911 ("[M]entally ill prisoners find themselves in segregated, high-security settings or, worse, in seclusion.").

[20] Mullan, *supra* note 18 at 109-10; *see also* Jeffrey L. Metzner & Jamie Fellner, *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. Am. Acad. Psychiatry & L. 104, 104-05 (2010), https://jaapl.org/content/jaapl/38/1/104.full-text.pdf; Peterson & Heinz, *supra* note 17, at 538-39.

[21] Mullan, *supra* note 18, at 109; *see also* Craig Haney, *The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment*, U.S. Dep't Health and Human Serv., Working Paper Prepared for the "From Prison to Home" Conference, 2001, http://aspe.hhs.gov/sites/default/files/migrated_legacy_files//42351/Haney.pdf.

[22] Gostin, *supra* note 14, at 911.

[23] *Id.*

11

characteristics intrinsic to an LWOP sentence—terminality, hopelessness—and the attendant circumstances—lack of access to programs, remotely located facilities—make the sentence harsh not only in its irrevocability but in its material conditions. Imposing such a sentence on a person with mental illness is all the crueler.

**II.    The imposition of a life without parole sentence on a person with mental illness for a misdemeanor act is contrary to the evolving standards of decency.**

A life without parole sentence is particularly harsh when applied to people who, like Mr. Iversen, commit misdemeanor acts while experiencing the symptoms of mental illness. Not only is this application unique, it also serves no legitimate penological purpose.

**A.    A life without parole sentence for a misdemeanor act is a "unique quirk" in Oregon law and is rarely applied.**

Life without parole sentences for misdemeanor acts are not only a rarity among state laws, but a unique quirk among Oregon's Revised Statutes. *See* R*iggs v. California*, 525 U.S. 1114, 119 S. Ct. 890, 891 (1999) (Stevens, J., in an opinion respecting the denial of a cert petition) (describing the interaction of two California statutes that allowed a sentence of 25 years to life in prison for petty theft—ordinarily a misdemeanor offense—with certain prior convictions as a "unique quirk in state law" and noting that "California appears to be the only State in which a misdemeanor would receive such a severe sentence."). *See* AOB 31.

12

In Oregon, few crimes may result in life without parole sentences. They include only (1) some murder offenses[24] and (2) some third or subsequent felony sex offenses under Or. Rev. Stat. § 137.719.[25] Public indecency is the only crime ordinarily prosecuted as a misdemeanor that can yield a life without parole sentence.[26] *Amicus curiae* can find no indication in the legislative history of Senate Bill 370, which created the sex offender recidivist statute, to suggest that lawmakers anticipated this unique quirk. Hearings on the bill instead centered around notification requirements imposed upon people subject to sex offender registration requirements.[27] A single question regarding the recidivist sentencing portion of the legislation was posed by a legislator who asked a community

---

[24] LWOP may be imposed for: (1) aggravated murder under Or. Rev. Stat. § 163.105(1) ("shall be sentenced . . . to death, life imprisonment without the possibility of release or parole or life imprisonment" with the possibility of release after 30 years); (2) murder in the first degree under Or. Rev. Stat. § 163.107(2) ("shall sentence . . . to life imprisonment" with the possibility of release after 30 years; "may sentence . . . to life imprisonment without the possibility of parole" when the court "state[s] on the record the reasons for imposing the sentence"); and (3) murder in the second degree when the victim was pregnant under Or. Rev. Stat. § 163.155 ("shall sentence . . . to life without the possibility of release or parole . . . unless . . . there are sufficient mitigating circumstances to warrant life imprisonment with the possibility of release or parole").

[25] LWOP is the presumptive sentence under Or. Rev. Stat. § 137.719, but "[t]he court may impose . . . a departure sentence . . . based upon findings of substantial and compelling reasons."

[26] As the Oregon Supreme Court has noted, "unlike felony public indecency, most of the other felony sex crimes that may result in the imposition of a true-life sentence under Or. Rev. Stat. § 137.719 involve nonconsensual sexual contact or sexual exploitation of child victims." *Davidson,* 369 Or. 480, 501, 507 P.3d 246, 257-58 (2022) (quoting *Davidson I*, 360 Or. 370, 388, 380 P.3d 963, 973 (2016)). While there is certainly harm, "unwillingly observing sexual behavior by another person is not a harm of the same magnitude as being specifically and personally subjected to unwanted physical sexual contact or sexual violence." *Davidson I*, 360 Or. at 386, 380 P.3d at 972.

[27] Tape Recording, Senate Comm. on Judiciary, SB 370, April 3, 2001, Tapes 82-85; Tape Recording, Senate Comm. on Judiciary, SB 370, May 10, 2001, Tapes 132, Side B.

13

member who testified against the bill how he felt about "Washington's '3 strikes you're out' approach."[28] Lawmakers did not address the question of which felony sex offenses should be subject to Oregon's recidivist law, nor was there any acknowledgement of the double-recidivist scheme that could be applied to public indecency due to the interaction of Or. Rev. Stat. § 163.465(2)(b) and the language in the bill.[29]

Though people convicted of aggravated murder in Oregon may be sentenced to death, LWOP, or life with parole, Or. Rev. Stat. § 163.105(1), with the passage of Oregon Senate Bill 1013 in 2019, most types of conduct that were formerly classified as aggravated murder are now considered murder in the first degree. What previously resulted in a sentence of death, LWOP, or life with the possibility of parole is now subject to a presumptive sentence of life in prison with the possibility of parole after 30 years.[30] Thus, under current law, the intentional killing of multiple people, for example, is generally charged as murder in the first degree and carries a presumptive sentence of life *with* parole. Or. Rev. Stat. § 163.107. Even when a person is convicted of multiple counts of murder in the first degree based on the killing of multiple victims and given consecutive life sentences, after

---

[28] *Id.*

[29] *Id.*

[30] Alternatively, a person convicted of murder in the first degree "may" receive a sentence of life without the possibility of parole; when imposing such a sentence, the court must "state on the record the reasons for imposing that sentence." Or. Rev. Stat. § 163.107(2).

thirty years, the parole board "shall hold a hearing to determine if the prisoner is likely to be rehabilitated within a reasonable period of time." Or. Rev. Stat. § 163.107(3)(a); *see Severy/Wilson v. Board of Parole and Post-Prison Supervision*, 349 Or. 461, 245 P.3d 119 (2010). Conversely, people convicted of public indecency with prior felony sex offenses are presumptively subject to a sentence of life without parole.

The severity of the presumptive punishment for the intentional killing of multiple people—or for the intentional killing of one person where the defendant has one, two, or more prior convictions for any degree of murder or manslaughter in the first degree—has been lessened to reflect a change in societal standards. Yet the presumptive LWOP sentence for a person convicted of a third or subsequent felony sex offense, including public indecency, remains a unique relic of the past.

Further, if a court were to find there were "substantial and compelling reasons" to impose less than the presumptive LWOP term, it could only sentence a person in Mr. Iverson's position to a maximum of sixty months in prison. Or. Rev. Stat. § 163.465(2)(b); *State v. Davidson*, 369 Or. 480, 507 P.3d 246 (2022) (holding that departure sentences for felony public indecency under Or. Rev. Stat. § 163.465 must be imposed in conformity with Oregon's felony sentencing guidelines); Or. Admin. Rule 213-017-0006 (categorizing felony public indecency as a crime category six on the Crime Seriousness Scale); Or. Admin. Rule 213-004-0001 App.

1 (demonstrating that the maximum guidelines sentence for a category six offense is ordinarily thirty months in prison); Or. Admin. Rule 213-008-0003(2) (allowing the court to impose a departure sentence that is double the sentence indicated in Or. Admin. Rule 213-004-0001 App. 1). Such a disparity between the presumptive and departure sentences suggests there is a fundamental issue with proportionality. How can a punishment be "graduated and proportioned to [the] offense," *Weems*, 217 U.S. at 367, when the sentencing options are either up to five years or eternity, with nothing in between? Are there no facts and circumstances that would warrant a prison term of six, seven, ten, or twelve years, but which would make LWOP unconstitutionally disproportionate? The unavailability of graduated sentences falling between sixty months and life means that, by definition, at least some LWOP sentences imposed under the statutory scheme are disproportionate.

The web of statutes that causes this unique sentence for public indecency is also rarely applied, suggesting a "consensus has developed against it." *Atkins*, 536 U.S. at 316. Data from the Oregon Criminal Justice Commission and the Oregon eCourt Case Information system reveals that, of the 12,282 people incarcerated in Oregon prisons,[31] Mr. Iversen is one of five serving an LWOP sentence for public indecency. The other 172 people serving LWOP sentences were imprisoned for

---

[31] Or. Dept. of Corrections, *AIC Population Profile for 03/01/2023*, https://www.oregon.gov/doc/Documents/inmate-profile.pdf (last visited Mar. 15, 2023).

homicide and felony sexual offenses, such as child sexual abuse and rape. In contrast, there are 89 people in Oregon custody serving sentences of life *with* the possibility of parole for the crime of aggravated murder.

Life without parole for a misdemeanor act—or any act—is an international rarity as well. Fewer than forty United Nations member states permit LWOP sentences, including only ten countries in Europe and only four in Latin America.[32] The imposition of life without parole for lesser crimes is even more unusual internationally: other nations that allow for LWOP sentences "use the penalty sparingly and only in the most extreme cases, such as the murder of two or more people or of a child, or murder for political, religious, or ideological reasons."[33] Only the United States and Uganda have seen widespread life without parole sentences for crimes less serious than murder.[34]

## B.     A life without parole sentence for a misdemeanor act, particularly for a person with mental illness, does not serve legitimate penological goals.

The Supreme Court has held that "[a] sentence lacking any legitimate penological justification is by its nature disproportionate to the offense." *Graham*, 560 U.S. at 71. The three principal rationales of punishment are "rehabilitation,

---

[32] *See* Victoria Law, *Prisoner Advocates Turn to the UN to End Extreme Prison Sentences*, The Nation (Sept. 15, 2022), https://www.thenation.com/article/society/extreme-prison-sentences-united-nations/.
[33] *Id.*
[34] *See* Penal Reform International, *Life Imprisonment: A Policy Briefing*, at 4 (2018), https://cdn.penalreform.org/wp-content/uploads/2018/04/PRI_Life-Imprisonment-Briefing.pdf.

deterrence, and retribution." *Kennedy*, 554 U.S. at 420. As with the death penalty, rehabilitation is not an applicable rationale for LWOP sentences.[35] Likewise, the penological justifications of retribution and deterrence apply with less force to people with mental illnesses—and people who have committed misdemeanor acts.

"The heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender." *Tison v. Arizona*, 481 U.S. 137, 149 (1987). As the Supreme Court has concluded, "[r]etribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity," *Roper*, 543 U.S. at 571—or, as here, mental illness, which may "impair[] judgment, rationality, and the ability to foresee consequences and control behavior."[36] In other words, mental illnesses can produce effects that reduce volitional control and blameworthiness to the same degree as intellectual disability and juvenile status:

> The concepts of responsibility and blameworthiness that justify punishment require that the individual have been capable of doing other than what was done. Punishment for an act prohibited by the criminal law is appropriate only when, at the time of the offense, an individual possesses "the normal capacities, physical and mental, for . . . abstaining from what it forbids, and a fair opportunity to exercise these capacities."

---

[35] *See Gregg v. Georgia*, 428 U.S. 153, 183 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.).

[36] Bruce J. Winick, *The Supreme Court's Evolving Death Penalty Jurisprudence,* 50 B.C. L. Rev. 785, 814 (2009).

> Unless an individual can control his behavior, it is inappropriate for him to receive the moral condemnation and punishment applied in the criminal justice system of social control. Punishment is only justified for those who have the capacities of awareness and control needed to be moral agents.[37]

Not only is mental illness a standard mitigating factor generally raised in the penalty phase of criminal cases (pursuant to accepted standards of effective representation and statute), but capital jurors are less likely to impose a death sentence after learning of the defendant's "history of mental illness."[38] Indeed, seventy-five percent of people surveyed nationally in 2002 opposed executing people with mental illness.[39]

Similarly, criminal sanctions are unlikely to serve the principle of deterrence for people experiencing severe mental illness; this is particularly true with regard to people diagnosed with compulsive disorders. Deterrence is predicated on the idea that punishing people who have committed crimes will send a message to others who might be contemplating criminal acts that they too will suffer punishment if they carry out their plans. Besides growing skepticism on the general effectiveness of the deterrence rationale,[40] the Supreme Court has acknowledged

---

[37] *Id.* at 820–21 (citation omitted) (alteration in original).

[38] Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What do Jurors Think?*, 98 Colum. L. Rev. 1538, 1565 (1998).

[39] Kevin Drew, *Arkansas Prepares to Execute Mentally Ill Inmate*, CNN.com (Jan. 5, 2004), http://www.cnn.com/2004/LAW/01/05/singleton.death.row/index.html.

[40] *See* Letter from Abolitionist Law Center et al., to Special Rapporteur E. Tendayi Achiume et al., at 30 (Sept. 15, 2022), https://drive.google.com/file/d/1QdC2WIKr_7u4zkTn-2-2_jqjNg7mIa42/view.

that where mental illness prevents people from "exercising adequate control over their behavior," the threat of confinement is unlikely to deter. *Kansas v. Hendricks*, 521 U.S. 346, 362 (1997). In the analogous context of intellectual disability, the Court has further noted that:

> [I]t is the same cognitive and behavioral impairments that make these defendants less morally culpable—for example, the diminished ability to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses—that also make it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information.

*Atkins*, 536 U.S. at 320.

Finally, to the extent that incapacitation is a valid penological purpose, "[t]he incontrovertible scientific evidence demonstrates that future dangerousness determinations are, at best, wildly speculative."[41] For more than thirty years, "the American Psychiatric Association has maintained that predictions of future threats are wrong in at least two out of every three cases,"[42] and confirmed that "[m]edical knowledge has simply not advanced to the point where long-term predictions . . . may be made with even reasonable accuracy."[43] "These assertions remain

---

[41] William W. Berry III, *Ending Death by Dangerousness: A Path to the De Facto Abolition of the Death Penalty*, 52 Ariz. L. Rev. 889, 907 (2010).

[42] *Id.* (citation omitted).

[43] *Id.* (citation omitted).

20

supported by recent studies that continue to demonstrate the extreme inaccuracy in predicting future dangerousness."[44]

The evolving standards of decency weigh against LWOP sentences for people who, like Mr. Iversen, commit misdemeanor acts due to mental illness. The infrequency with which LWOP is imposed on people convicted of public indecency and the dearth of penological purposes of LWOP for such people— particularly when mental illness is at issue—make the sentence unconstitutionally disproportionate when applied to Mr. Iversen and people similarly situated.

## Conclusion

Mr. Iversen's sentence of life without parole for the "misdemeanor act" of public indecency constitutes cruel and unusual punishment under the Eighth Amendment. By practice, LWOP is the most severe punishment available in Oregon, and by statute, it is sparingly applied. Further, Mr. Iversen has been diagnosed with treatable psychological disorders. *See* ER-160-166. His actions in this case, directly related to impulse control, are the manifestations of his mental illness. A life without parole sentence as applied to Mr. Iversen is contrary to the

---

[44] *Id.* at 908 ("The results of these studies ought not to be surprising, given that mental health professionals themselves are skeptical of their own predictions. In a study of several hundred practicing physicians, clinical psychologists, and mental health lawyers, the mean self-reported estimate of percentage of accurate future dangerousness predictions fell between forty and forty-six percent. Thus, the inability of psychiatrists, much less judges and jurors, to make determinations of future dangerousness with any reliability casts doubt upon the ability to rely on incapacitation as a justification for life without parole.").

evolving standards of decency, to current understandings of the nature and purpose of punishment, and to modern conceptualizations of mental illness as warranting treatment over eternal incarceration.

The Court should reverse the dismissal of Mr. Iversen's petition for a writ of habeas corpus, grant the writ, and remand with instructions to enter an order vacating the sentence and directing the court to proceed with resentencing in accordance with this Court's opinion.

/s/: Walter Fonseca

Walter Fonseca
Attorney for *Amicus Curiae*
Oregon Justice Resource Center

22

## CERTIFICATE OF COMPLIANCE

This brief complies with Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 29-2(c)(3) because it contains 5,599 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface and type-style requirements of Fed. R. App. P. 32(a) because it has been prepared in a proportionally spaced, 14-point Times New Roman font.

Dated: March 16, 2023

/s/: Walter Fonseca

Walter Fonseca
Attorney for *Amicus Curiae*
Oregon Justice Resource Center